IVANHOE PARTNERS, a Texas general
partnership, et al., Plaintiffs
Below, Appellants,

v.

NEWMONT MINING CORPORATION,
a Delaware corporation, et al.,
Defendants Below, Appellees.

In re NEWMONT MINING CORP.
SHAREHOLDERS LITIGATION.

Supreme Court of Delaware.

Submitted: Nov. 4, 1987.
Decided: Nov. 18, 1987.

Charles F. Richards, Jr. (argued), William J. Wade, Samuel A. Nolen, Thomas A. Beck, Gregory P. Williams, C. Stephen Bigler, Anne F. Bugg and Cynthia D. Kaiser, of Richards, Layton & Finger, Wilmington, for appellant Ivanhoe Partners.

Norman M. Monhait, of Morris, Rosenthal, Monhait & Gross, Wilmington, Robert A. Skirnick (argued) and John Halebian, of Wolf Popper Ross Wolf & Jones, and Robert A. Wallner, of Milberg Weiss Bershad Specthrie & Lerach, New York City, for appellant Shareholders.

Michael D. Goldman, Charles S. Crompton, Jr., Donald J. Wolfe, Jr. and Richard L. Horowitz, of Potter, Anderson & Corroon, Wilmington, Bernard W. Nussbaum (argued) and Paul K. Rowe, of Wachtell, Lipton, Rosen & Katz, and John J. McNally and Richard J. Holwell, of White & Case, New York City, of counsel, for appellees Newmont Min. Corp. and its directors.

John H. Hall, of Debevoise & Plimpton, New York City, for appellees Independent Directors of Newmont Min. Corp.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh and Kenneth Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, Lewis A. Kaplan (argued), Moses Silverman, Colleen McMahon, Abby Jennis and Clyde Allison, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for appellees Consol. Gold Fields PLC, Gold Fields American Corp. and The Special Purpose, Inc.

Rodman Ward, Jr. and Edward P. Welch, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for intervenor The First Boston Corp.

Donald Elihu Evans, of Bryde, Ament & Evans, Wilmington, for intervenors the New York Stock Exchange and the Nat. Securities Clearing Corp.

Before CHRISTIE, C.J., MOORE, J., and BIFFERATO, Judge (sitting by designation pursuant to Del. Const., Art. IV, § 12).

MOORE, Justice:

We accepted this expedited interlocutory appeal from a decision of the Court of Chancery, denying a preliminary injunction to plaintiffs, in order to address certain defensive maneuvers taken in a battle for the control of Newmont Mining Corporation ("Newmont"), one of the largest gold producers in North America. In an attempt to block a hostile tender offer by Ivanhoe Partners and Ivanhoe Acquisition

Corporation (collectively "Ivanhoe"),[1] Newmont declared a $33 per share dividend to all its stockholders, which helped its largest shareholder, Consolidated Gold Fields PLC ("Gold Fields")[2], to engage in a "street sweep" of Newmont stock, thereby increasing Gold Field's ownership of Newmont from 26% to 49.7%.[3] The "street sweep" and its related transactions, including the dividend, and the extension of and amendments to a previously existing standstill agreement with Newmont, if proper, will effectively defeat Ivanhoe's bid.

Ivanhoe sought to enjoin the foregoing maneuvers as inequitable entrenchment devices violative of Newmont's and Gold Fields' fiduciary duties to Newmont shareholders under Delaware law. The Court of Chancery granted a temporary restraining order enjoining the consummation of Gold Fields' street sweep pending determination of Ivanhoe's motion for a preliminary injunction.[4]

However, after a subsequent hearing, the court vacated the temporary restraining order and denied Ivanhoe's motion for a preliminary injunction, ruling that any

breach of fiduciary duty which may have existed prior to the temporary restraining order had been rectified by a subsequent amendment to the standstill agreement between Newmont and Gold Fields. *See Ivanhoe Partners v. Newmont Mining Corp.*, Del.Ch., 533 A.2d 585, 609 (1987). We therefore consider the propriety of all these transactions under the fiduciary obligations established in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), and *Revlon, Inc. v. MacAndrews & Forbes Holdings Inc.*, Del.Supr., 506 A.2d 173 (1986).[5]

The Vice Chancellor found, and the record supports his conclusions, that the decisions of Newmont's board to facilitate the street sweep by issuance of the dividend, and to consumate a new standstill agreement, were taken in good faith after reasonable investigation in response to threats by both Gold Fields and Ivanhoe to Newmont's corporate policy and effectiveness. Under the circumstances, Newmont had both the power and the duty to oppose Ivanhoe's tender offer. *Unocal*, 493 A.2d

1. Ivanhoe Partners is a Texas general partnership. Ivanhoe Acquisition Corporation is a Delaware corporation specifically formed to make a tender offer for Newmont. Both entities have been formed and are controlled by T. Boone Pickens, Jr.

2. Gold Fields is a multinational producer of gold, with interests and operations in South Africa, Australia, and the United States. Gold Fields' principal holding company, Consolidated Gold Fields PLC, is a United Kingdom corporation. Consolidated Gold Fields, PLC's subsidiaries, Gold Fields American Corporation, and The Special Purpose, Inc., are both Delaware corporations. Gold Fields executed the street sweep through its subsidiaries, Gold Fields American Corporation and The Special Purpose, Inc. These corporations will be referred to collectively as "Gold Fields."

3. "Street sweep" refers to the rapid acquisition of securities on the open market during and shortly after the pendency of a tender offer for the same class of securities. The shares are ordinarily purchased at a premium from arbitrageurs.

The Securities and Exchange Commission (SEC) has unsuccessfully challenged street sweeps as a violation of the Williams Act. *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d

Cir.1985); *SEC v. Carter Hawley Hales Stores, Inc.*, 760 F.2d 945 (9th Cir.1985). As a result, the SEC has proposed a rule which would require that all purchases during and shortly after a tender offer that would increase any shareholder's ownership by 10% or more be made in compliance with the rules applicable to tender offers. Acquisitions of Substantial Amounts of Securities and Related Activities Undertaken During and Following a Tender Offer for those Securities, Exchange Act Release No. 24976, [Current] Fed.Sec.L.Rep. (CCH) par. 89,160 (Oct. 1, 1987).

4. In response to Newmont's opposition to Ivanhoe's takeover bid, numerous class action lawsuits were filed on behalf of Newmont stockholders, against Newmont, its directors and Gold Fields. Those class actions were consolidated in the Court of Chancery and in this Court. For the purpose of this decision the interests of Ivanhoe and the class plaintiffs are essentially identical.

5. This appeal was heard on an expedited basis in light of the pending Ivanhoe offer and the Newmont–Gold Fields transactions. We accepted the appeal on Friday, October 16, 1987, received the plaintiffs' opening briefs on October 23, the defendants' answering briefs on October 30, the plaintiffs' reply briefs on November 2,

at 953–55. The record also sustains the conclusion that these defensive measures were reasonable in relation to the threats posed, and that the board acted to meet them in the proper exercise of its sound business judgment. *Id.* at 955. Further, the *Revlon* obligation to conduct a sale of the corporation did not arise under the circumstances here. *Revlon,* 506 A.2d at 182. Newmont was not for sale. Thus, there was no duty of its directors to maximize "the company's value at a sale for the stockholders' benefit." *Id.* at 182. Accordingly, there being no entrenchment, the defensive measures adopted by Newmont are protected by the business judgment rule. *Unocal,* 493 A.2d at 954 (citing *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971)). We, therefore, affirm.

## I.

The facts are fully detailed in the trial court's lengthy opinion. *See Ivanhoe Partners,* 533 A.2d 585. We will not repeat them here except as is necessary for an explication of our views.

The critical events of this case occurred in the brief span of five weeks between August 18 and September 22, 1987. Also of significance are certain facts occurring before 1987 which shaped the historical relationship between Newmont and Gold Fields.

In 1981 Gold Fields began vigorously acquiring Newmont stock.[6] Newmont immediately sued to enjoin Gold Fields' acquisition of a significant or controlling interest. Ultimately, Newmont agreed to allow Gold Fields to purchase up to a one-third interest in the company, but in return Newmont demanded that Gold Fields sign a standstill agreement. That accord, which in 1983 was amended and extended for ten

years, limited Gold Fields' interest in Newmont to 33⅓%, restricted Gold Fields' representation on the board to one third the total number of directors, required Gold Fields and Newmont to support the other's director nominees, and gave Newmont a right of first refusal in the event Gold Fields decided to sell its interest. *Ivanhoe Partners,* 533 A.2d at 591. Of particular significance is that the standstill agreement also provided that Gold Fields could terminate the arrangement at its option upon acquisition by a third party of 9.9% or more of Newmont's outstanding shares. Gold Fields maintained a 26% interest from 1981 until recently, when Ivanhoe's purchase of 9.95% triggered Gold Fields' option to terminate the contract.

On August 13, 1987 Ivanhoe announced that it had acquired 8.7% of Newmont. Significantly, Ivanhoe soon took the deliberate step to increase its Newmont holdings to 9.95%, which thereby freed Gold Fields to terminate the standstill agreement. This was done intentionally with the hope that Gold Fields then would ally itself with Mr. Pickens and his Ivanhoe affiliates, either to take over Newmont and to divide it among themselves, or to reach some other mutually advantageous arrangement. This Ivanhoe tactic prompted a series of strategic maneuvers and responses by each of the three parties. In anticipation of a battle with Ivanhoe, Newmont began implementing traditional defensive measures.[7] However, in doing so Newmont found itself in the peculiar position of having simultaneously to fear and to court Gold Fields. Although Newmont and Gold Fields had enjoyed a compatible business association for some time, Gold Fields now was freed of its prior constraints. It had the option to acquire control of Newmont.

and heard argument on Wednesday, November 4.

**6.** Before acquiring more than a 50% interest in Newmont, Gold Fields would have had to obtain shareholder approval, clearance in the United States under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, and the approval of the London Stock Exchange. Aside from these legal barriers Gold Fields had a fundamental

corporate policy of limiting its ownership to minority interests in foreign (non-U.K.) corporations.

**7.** On August 18, 1987 the Newmont board approved "golden parachutes" which called for substantial severance payments to twenty-five key management employees.

On September 7, Newmont's board approved a 2.25 billion dollar revolving credit agreement

In order to maintain a balance in their relationship, Newmont exempted Gold Fields from these defensive measures. Nonetheless, the Vice Chancellor found that Gold Fields' was rationally perceived as a threat to Newmont's continued independence. Specifically, throughout its relationship with Newmont, Gold Fields had demonstrated that it had its own independent objectives which were not necessarily congruent with Newmont's.

On August 31 Ivanhoe sent Newmont a letter requesting a meeting to discuss the acquisition by Ivanhoe of all of the remaining Newmont common stock.[8] By separate letter, Ivanhoe solicited Gold Fields to discuss "a broad range of alternatives" concerning the disposition of their Newmont stock. On September 8, when these letters proved fruitless, Ivanhoe commenced a hostile tender offer for 42% of Newmont at $95 per share. Among other things the tender offer was contingent upon Ivanhoe's obtaining financing, the source of which was not disclosed.[9]

Furthermore, the Offer to Purchase disclosed that Ivanhoe would seek to acquire all remaining shares in a second step transaction at $95 per share cash which, likewise, was subject to obtaining financing. The offer stated that no specific second step transaction had been devised, and that there was no firm commitment to do so.

The Newmont directors had to quickly address numerous problems.[10] Based in part upon a presentation by its independent financial adviser, Goldman, Sachs and Company ("Goldman Sachs"), the board determined that the $95 offer was inadequate. When Ivanhoe attempted to remove the current board by shareholder consent, the directors amended the bylaws to delay the effect of any consent solicitation for twenty days. The board also undertook two major tasks to defend against the perceived Ivanhoe and Gold Fields threats. First, in an effort to protect Newmont's independence, the board began exploring alternatives with Gold Fields to discourage it from terminating the standstill agreement. Second, the board proposed an aggressive business and capital program (the "Gold Plan") which included the disclosure of liberal estimates of reserves and a corresponding increase in the gold production estimates by 50%.[11] *Ivanhoe Partners*, 533 A.2d at 595.

Ivanhoe then raised its tender offer price to $105 on September 16. Two days later the Newmont Board met to consider the revised offer and found that it, too, was inadequate. The Board's decision was made after a second presentation by Goldman Sachs which included revised figures based on the Gold Plan.[12] At the same meeting Newmont's management offered a "restructuring" proposal designed to deal with the threats posed by Gold Fields and Ivanhoe. This proposal consisted of the declaration of a large dividend to be financed by the sale of Newmont's non-gold assets, and the signing of a new standstill agreement with Gold Fields to insure Newmont's independence. The purpose of the

which provided for default of the loans if an entity acquired 50% or more of Newmont.

**8.** In Wall Street parlance this is known as a "bear hug" letter which is commonly understood to mean a proposal by a hostile bidder to acquire all of the target's outstanding stock in a privately negotiated transaction.

**9.** Ivanhoe now claims to have commitments for financing of up to 1.25 billion dollars.

**10.** Newmont's board consisted of nine members: three management directors; two outside directors affiliated with Gold Fields; and four independent directors. Throughout the board's consideration and adoption of the various defensive mechanisms described here, the two Gold Fields' directors recused themselves. Thus

all relevant actions taken by the remaining directors bore the imprimatur of a board majority consisting of four independent directors.

**11.** The Gold Plan called for the acceleration of exploration and production activities. Although Ivanhoe strenuously disputes the trial court's findings, there is support for a conclusion that even though the Gold Plan was timed to defeat the Ivanhoe offer, the adoption of the Gold Plan and the resulting higher Newmont stock valuation, were not mere "puffery".

**12.** The valuation by Goldman Sachs is a much disputed issue in this case. We find it significant that in its final analysis, Goldman Sachs opined that at a price of $105 per share Ivanhoe would still acquire the two Newmont gold subsidiaries at an 8.7% discount.

dividend was to reduce liquidity, thus making Newmont a less attractive target, to distribute the value of its non-gold assets to all of the shareholders (including Ivanhoe), and to facilitate Gold Fields' street sweep. Significantly, the proposed standstill agreement would limit Gold Fields' control of Newmont, thereby assuring the latter's continued independence.

Although Gold Fields had considered breaking the standstill agreement and going into the open market to purchase control of Newmont, *Ivanhoe Partners*, 533 A.2d at 596, the prospect of accomplishing a similar yet more restricted objective with only a small capital investment was very attractive.[13] Thus, the dividend became the linchpin for negotiating the new standstill agreement.

By September 20, 1987 Newmont and Gold Fields had reached an accord. This new agreement allowed Gold Fields to purchase up to 49.9% of Newmont stock, but effectively limited its representation on the Newmont board to 40% of the total directors. Additionally, Gold Fields was required to support the board's slate of nominees for the remaining board positions, and was prohibited from transferring its interest to any third party who refused to be bound by the standstill.

Once executed, the new agreement was delivered to Newmont in escrow conditioned upon the declaration of a $33 dividend.[14] On September 21 and 22, Gold Fields, consistent with the terms of the accord, and facilitated by the dividend, "swept the street", purchasing approximately 15.8 million Newmont shares at an average price of $98 per share and increasing their interest to 49.7%.

On September 23, Ivanhoe sued to enjoin or rescind the $33 per share dividend and the street sweep. On the same day the Court of Chancery granted Ivanhoe's motion for a temporary restraining order prohibiting future trading by Gold Fields in Newmont stock.[15] The Vice Chancellor's decision to grant the temporary restraining order was based on his preliminary conclusion that two aspects of the standstill agreement had entrenching effects: 1) a restriction upon Gold Fields' tendering of its shares into any offer, and otherwise transferring those shares unless the transferee agreed to be bound by the standstill agreement and 2) a requirement that Gold Fields vote for the board's nominees. *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Ch., No. 9281 (September 23, 1987) (Ruling of the Court). To address the Vice Chancellor's concerns, Gold Fields and Newmont amended the agreement on September 27: 1) to allow Gold Fields to tender into an "any or all" tender offer if the offeror had firm commitments for financing, and 2) to provide that Gold Fields and Newmont would use their best efforts to establish cumulative voting. In his October 15 opinion, the Vice Chancellor held that these amendments cured the breach of fiduciary duty which resulted from the former offending provisions, and denied Ivanhoe's motion for a preliminary injunction. *Ivanhoe Partners*, 533 A.2d at 610. Thus, from Newmont's standpoint the September 20 accord, as amended, had several provisions which were vitally important to it: 1) Gold Fields' holdings were limited to 49.9%, 2) the standstill was extended to 1997, and 3) of particular significance, an independent board was established consisting of 40% Gold Fields directors, 40% independent directors and 20% Newmont directors.

## II.

■ Since the decision below denying Ivanhoe's motion for a preliminary injunction was based entirely on a paper record,

---

**13.** Throughout this period Gold Fields' investment banker, The First Boston Corporation, urged Gold Fields to break the standstill agreement and independently sweep the street, gain control of Newmont, and declare a dividend.

**14.** The $33 figure represents the liquidation value of the non-gold assets. *Ivanhoe Partners*, 533 A.2d at 597 n. 13.

**15.** The order was subsequently enlarged to force Gold Fields to "hold separate" the shares acquired in the street sweep. *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Ch., No. 9281 (September 28, 1987) (Letter Opinion) [Available on WESTLAW, DE–CS database].

the standard and scope of review on appeal requires this Court to review the entire record and draw its own conclusions with respect to the facts if the findings below are clearly wrong and justice requires us to do so. *Application of Delaware Racing Ass'n.*, Del.Supr., 213 A.2d 203, 207 (1965); *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982). However, we do not ignore the findings of the trial judge. If they are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them, even though independently we might have reached opposite conclusions. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

█ A plaintiff seeking a preliminary injunction must demonstrate both that there is a reasonable probability of success on the merits and that, absent the injunction, some irreparable harm will occur. Additionally, the plaintiffs must show that the harm they will suffer if the relief is denied outweighs the harm defendants will suffer if the relief is granted. *Gimbel v. Signal Companies, Inc.*, Del.Ch., 316 A.2d 599, 602, *aff'd*, Del.Supr., 316 A.2d 619 (1974); *Revlon*, 506 A.2d at 179.

█ Since this case involves the actions of a board of directors in the face of a takeover, the probability of success of Ivanhoe's claim must be analyzed under the well established standard of *Unocal.* Ivanhoe contends that the standstill agreement tainted the Newmont directors with a personal interest which requires that the challenged acts be evaluated under the intrinsic fairness test rather than the business judgment rule. *See Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983). However, the record does not support a conclusion that the directors appeared on both sides of the transaction, or that they derived any personal financial benefit from it which did not devolve upon the corporation and the shareholders gener-

ally. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984); *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717 (1971). Thus, we do not start with an intrinsic fairness analysis.

█ The board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del.C.* § 141(a) (1983).[16] In meeting this responsibility the board is charged with fiduciary obligations of care and loyalty. *Aronson*, 473 A.2d at 812; *Revlon*, 506 A.2d at 179; *Unocal*, 493 A.2d at 954-56. Under the business judgment rule, directors' decisions are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *Aronson*, 473 A.2d at 812; *Revlon*, 506 A.2d at 180; *Unocal*, 493 A.2d at 954. This presumption and its underlying fiduciary duties are equally applicable in a takeover context. *Pogostin v. Rice*, Del. Supr., 480 A.2d 619, 627 (1984). When directors oppose a hostile takeover there arises "the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders ..." *Unocal*, 493 A.2d at 954. This Court has addressed that potential for conflict by placing upon the directors the burden of proving that they have not acted solely or primarily out of a desire to perpetuate themselves in office, that the threatened takeover posed a danger to corporate policy and effectiveness, and that the defensive measures adopted are reasonable in relation to the threat posed. *Id.* The target directors must satisfy these prerequisites by showing good faith and reasonable investigation before enjoying the presumptions afforded by the business judgement rule. *Id.* at 955. This requires directorial analysis of the nature of the takeover bid and its effect on the corporate enterprise. Thus, the board may under appropriate circumstances consider the inadequacy of the bid, the nature and

---

**16.** The pertinent provision of the statute is:
   (a) The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. 8 *Del.C.* § 141(a) (1983).

timing of the offer, questions of illegality, the impact on constituencies other than shareholders, the risk of nonconsummation, and the basic stockholder interests at stake, including the past actions of the bidder and its affiliates in other takeover contests. *Id.* at 955–56.

## A. The Ivanhoe Threat

■ This Court has recognized the coercive nature of two-tier partial tender offers. *Unocal,* 493 A.2d at 956. Here, not only did the Ivanhoe offer fit perfectly the mold of such a coercive device, but after reasonable investigation the offer was found by the Newmont board to be inadequate. The Vice Chancellor held that this finding of inadequacy was justified, and his conclusion is fully supported by the record. *Ivanhoe Partners,* 533 A.2d at 597 n. 12. Furthermore, Newmont and Gold Fields specifically recognized that Mr. Pickens, who controls Ivanhoe, had been involved in several attempts to acquire and break-up other corporations, resulting in the payment of "greenmail" or severe restructuring of the target companies. *See, e.g., Unocal,* 493 A.2d at 952, 956–57; *Mesa Partners v. Phillips Petroleum Co.,* Del. Ch., 488 A.2d 107 (1984). The series of Ivanhoe maneuvers, including the secret acquisition of shares, the "bear hug" letter, the coercive partial tender offer and inadequate bid were all viewed by the defendants as classic elements of Mr. Pickens' typical *modus operandi.* Thus, the Newmont board could properly conclude that the Ivanhoe tender offer was not in the shareholders' best interests or those of their company. *Unocal,* 493 A.2d at 952, 956–57.

## B. The Gold Fields Threat

Gold Fields did not make a public bid for Newmont, and in more recent years there appears to have been a congenial relationship between the two companies. From the outset Gold Fields publicly expressed its support for the Newmont management. A Gold Fields press release stated:

> Consolidated Gold Fields has had a long, close and valued relationship with New-

mont. Although Ivanhoe Partners' actions give Gold Fields the right to terminate the standstill agreement, we do not intend to exercise that right at this time, and we have no wish to seek control of Newmont. We strongly support Newmont management and believe it to be in our interest as the largest shareholder, and in the interest of all Newmont shareholders, that management be allowed to continue to direct Newmont's affairs....

Throughout the weeks of harried activity Gold Fields continued to publicly support Newmont's management. Despite this, Newmont contends that it was threatened by the stark possibility that Gold Fields would cancel the 1983 standstill agreement and acquire control of the company, thus leaving the remaining shareholders without protection on the "back end". The record is replete with examples of the reality of this threat. A clear danger was posed by Ivanhoe's deliberate acquisition of 9.95% of Newmont shares, designed to free Gold Fields from the agreement, thereby permitting Ivanhoe and Gold Fields to ally themselves against Newmont. But even without Ivanhoe, Gold Fields now could wrest control away from the public shareholders. In addition, as the Newmont board was aware, Gold Fields had the necessary financial backing to unilaterally "sweep the street" and obtain control of Newmont. *See Ivanhoe Partners,* 533 A.2d at 607. Finally, the threat which Gold Fields posed was real. The Gold Fields board had in fact paused to weigh its options. Throughout these maneuvers it had considered in earnest the possibility of either independently purchasing control of Newmont or selling its interest to Ivanhoe. *Id.* at 595.

## C. The Response

■ Ivanhoe argues that, even if it and Gold Fields did pose a threat to Newmont's corporate policy and effectiveness, the Newmont directors failed to satisfy the second part of their *Unocal* burden—that their response be reasonable in relation to the threat posed. *Unocal,* 493 A.2d at 955. In examining that contention, *Unocal* requires us to carefully assess the reasonableness of the defensive measures em-

ployed and the results achieved. *Id.* Because Newmont's actions here are so inextricably related, the principles of *Unocal* require that they be scrutinized collectively as a unitary response to the perceived threats.

■ It is significant that throughout the consideration and adoption of these proposals, the Gold Fields directors recused themselves from participation in the Newmont board meetings, leaving an alliance of four independent and three management directors. Thus, with the independent directors in the majority, proof that the board acted in good faith and upon reasonable investigation is materially enhanced. *Id.* at 955. *See Polk v. Good,* Del.Supr., 507 A.2d 531, 537 (1986); *Revlon,* 506 A.2d at 176 n. 3; *Moran v. Household Int'l, Inc.,* Del.Supr., 500 A.2d 1346, 1356 (1985); *Aronson,* 473 A.2d at 812, 815; *Puma v. Marriott,* Del.Ch., 283 A.2d 693, 695 (1971).

■ Turning to the $33 dividend, it served two significant purposes in defending against Ivanhoe's inadequate and coercive tender offer. First, the dividend distributed the heretofore undervalued non-gold assets to all of Newmont's shareholders. In doing so Newmont effectively eliminated the means by which Ivanhoe might have acquired Newmont's gold assets at a substantial discount to the detriment of the other stockholders. Second, the dividend provided the financial impetus needed to persuade Gold Fields to engage in the street sweep. Although Gold Fields had the requisite financing to implement such action independently of the dividend, its board was reluctant to invest the $1.6 billion dollars needed to obtain a majority interest in Newmont.

■ The resulting standstill agreement also was a reasonable response to the Gold Fields threat. To forestall Gold Fields entry into the open market to purchase a controlling interest to the detriment of Newmont's public shareholders, Newmont obtained the new standstill agreement which restricted Gold Fields' ability to purchase and exercise control of the corporation. Thus, Newmont exchanged the $33 dividend for a revised standstill agreement, which not only limited Gold Fields' ownership to 49.9%, but, significantly, restricted its board membership to 40%. This guaranteed Newmont's continued independence under a board consisting of 40% Gold Fields directors, 40% independent directors and 20% management nominated directors. Further, the 49.9% limit on Gold Fields' stock ownership protected Newmont's public shareholders from being squeezed out by an unbridled majority shareholder.

■ The final element of the tripartite defensive measure employed against Ivanhoe was the so-called "street sweep". Ivanhoe contends that Newmont and Gold Fields breached their fiduciary duties to the shareholders who sold their stock in that maneuver. Specifically, Ivanhoe claims that the shareholders were wrongfully coerced into selling in the street sweep, and that Gold Fields was privy to material inside information which facilitated the maneuver. Under *Unocal* we must determine whether the use of the street sweep, aided by Newmont, was a reasonable response to the Ivanhoe threat. Viewed in isolation the measure was a Gold Fields defense to protect its own interest in Newmont. However, for the purpose of evaluating the fiduciary duties of Newmont, we view the street sweep as part of Newmont's own comprehensive defensive strategy.

Ivanhoe's claim that the Newmont board supplied Gold Fields with inside information is without merit. The Vice Chancellor found that Gold Fields did not have access to any confidential material information about Newmont. *Ivanhoe Partners,* 533 A.2d at 604. While Newmont had given Gold Fields a financial analysis of the company, the information furnished was obsolete and immaterial. *Id.*

Ivanhoe's allegation that the street sweep was inequitably coercive is likewise unsupported by the record. In advancing this argument Ivanhoe relies on conclusory form affidavits executed by arbitrageurs who sold in the street sweep, and on a

proposed SEC regulation.[17] Several arbitrageurs signed affidavits stating that they were aware of the amended standstill agreement and the street sweep, and that they had no reasonable alternative but to sell Newmont stock. The Vice Chancellor correctly concluded that the affidavits failed to show that, but for the existence of the standstill, the affiants would have tendered to Ivanhoe. Thus, there was a complete failure of proof in that regard. In any event we are not persuaded on this record that a street sweep has the coercive effect claimed by Ivanhoe.

We, therefore, are satisfied that under all the circumstances Newmont's actions in facilitating the street sweep were reasonable. The measure was an essential part of Newmont's defensive plan, which enabled Newmont to maintain its independent status for the benefit of its other stockholders.

■ Finally, Ivanhoe's claim that Gold Fields breached its duty to the shareholders who sold in the street sweep is unfounded. Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation. *Unocal*, 493 A.2d at 958; *Aronson*, 473 A.2d at 815. By definition Gold Fields owed no fiduciary duty to the other shareholders of Newmont. Moreover, it is well established law that nothing precludes Gold Fields, or for that matter Ivanhoe, as a stockholder from acting in its own self-interest. *Unocal*, 493 A.2d at 958. It cannot be denied that it was very much in Gold Fields' interest to execute the street sweep in order to deter the break-up and squeeze out threat which Ivanhoe's inadequate, coercive two-tier bid posed to other shareholders, including Gold Fields. In the balance of the equation, and for sound reasons which we will not second guess, Gold Fields obviously considered its alignment with Newmont, even with the limitations the standstill agreement imposed, to be preferable to any arrangement with Ivanhoe and its affiliates.

17. For a synopsis of the SEC release see foot-

■ Of course we recognize that one who knowingly joins with a fiduciary, including corporate officials, in a breach of a fiduciary obligation is liable to the beneficiaries of the trust relationship. *Penn Mart Realty v. Becker*, Del.Ch., 298 A.2d 349, 351 (1972). But having found that Newmont breached no duty of loyalty to its shareholders by facilitating the street sweep, it follows that Gold Fields could not have violated *Unocal*'s applicable principles.

On this record we are satisfied that the defensive plans adopted by the Newmont board were reasonable in relation to the threats posed by Gold Fields and Ivanhoe. The Newmont board acted to maintain the company's independence and not merely to preserve its own control. It succeeded in that goal. Thus, the Newmont directors have satisfied their burden under *Unocal*, and their actions are within the ambit of the business judgment rule. *Unocal*, 493 A.2d at 954–55. *See also Revlon*, 506 A.2d at 180 n. 10.

### III.

Ivanhoe claims that the Newmont directors breached the duties imposed upon them in *Revlon* by refusing to entertain Ivanhoe's bid. Ivanhoe argues that under *Revlon* the board was charged with securing the highest available price for the company. However, the facts presented here do not implicate this *Revlon* principle.

■ *Revlon* involved the lock-up of a corporation amidst a bidding war for the company between a hostile party and a friendly bidder. The lock-up was effected after the board of directors had authorized management to "sell" the corporation. This Court held that when "the break-up of [a] company [is] inevitable . . . [t]he duty of the board . . . change[s] from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit." *Revlon*, 506 A.2d at 182. Under such circumstances the directors became auctioneers "charged with getting the best price

note 3, *supra.*

for the stockholders at a sale of the company." *Id.* This involves duties of loyalty and care. The former embodies not only an affirmative duty to protect the interests of the corporation, but also an obligation to refrain from conduct which would injure the corporation and its stockholders or deprive them of profit or advantage. In short, directors must eschew any conflict between duty and self-interest. *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510 (1939); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983). They cannot succumb to influences which convert an otherwise valid business decision into a faithless act. *Aronson*, 473 A.2d at 816 (1984). On the other hand, the duty of care requires a director, when making a business decision, to proceed with a "critical eye" by acting in an informed and deliberate manner respecting the corporate merits of an issue before the board. *Smith v. Van Gorkom*, Del. Supr., 488 A.2d 858, 872–73 (1985); *Aronson*, 473 A.2d at 812, 816 (1984).

■ *Revlon* applies here only if it was apparent that the sale of Newmont was "inevitable". The record, however, does not support such a finding for two reasons.

First, Newmont was never for sale. During the short period in which these events occurred, the Newmont board held fast to its decision to keep the company independent. *Ivanhoe Partners*, 533 A.2d at 603. Ultimately, this goal was achieved by the standstill agreement and related defensive measures.

Second, there was neither a bidding contest, nor a sale. The only bidder for Newmont was Ivanhoe. Gold Fields was not a bidder, but wished only to protect its already substantial interest in the company. It did so through the street sweep. Thus, the Newmont board did not "sell" the company to Gold Fields. The latter's purchases were from private sellers. While Gold Fields now owns 49.7% of the stock, its representation on the board is only 40% because of the restrictions of the standstill agreement. These facts do not strip the Newmont board of the presumptions of independence and good faith under the business judgment rule. *Aronson*, 473

A.2d at 815. Even though Newmont's declaration of the dividend facilitated the street sweep, it did not constitute a "sale" of the company by Newmont.

On this record we are satisfied that the fiduciary obligations imposed by *Revlon* to sell a company to the highest bidder are not applicable here. We, therefore, find no merit in plaintiffs' contentions.

## IV.

In conclusion, Newmont's directors had both the duty and responsibility to oppose the threats presented by Ivanhoe and Gold Fields. *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 627 (1984); *Unocal*, 493 A.2d at 954. Further, the actions taken were reasonable in relation to the threats posed. *Id.* at 956. The comprehensive defensive scheme consisting of the dividend, standstill agreement, and street sweep accomplished the two essential objectives of thwarting the inadequate coercive Ivanhoe offer, and of insuring the continued interest of the public shareholders in the independent control and prosperity of Newmont. Under the circumstances, the board's actions taken by a majority of independent directors, are entitled to the protection of the business judgment rule. *Aronson*, 473 A.2d at 812, 815, 817; *Polk v. Good*, Del.Supr., 507 A.2d 531 (1986); *Revlon*, 506 A.2d at 176 n. 3, 180; *Unocal*, 493 A.2d at 955–56; *Puma v. Marriott*, Del. Ch., 283 A.2d 693, 695 (1971). Thus, unless the appellants demonstrate that the directors were solely or primarily motivated by entrenchment concerns, or another breach of a duty of loyalty or care, "this Court will not substitute its judgment for that of the board." *Unocal*, 493 A.2d at 958. The record does not support an entrenchment claim respecting the Newmont board's actions, and Ivanhoe failed to present evidence of any other breach of fiduciary duty. While the Vice Chancellor initially found two entrenching effects of the September 20 standstill agreement, which were cured by the September 27 amendment, we do not agree that the September 20 standstill breached any fiduciary duty. The agreement ensured an indepen-

dent board. The transfer restriction perpetuated the independent nature of the board and did not entrench Newmont management. The voting provision only required Gold Fields to cast its votes for the nominees of the entire independent board. Thus the September 20 standstill agreement was not a breach of the Newmont directors' duty of loyalty. *Aronson,* 473 A.2d at 812. This record clearly indicates that Ivanhoe has failed to meet its burden of proof. Accordingly, the judgment of the Court of Chancery, denying Ivanhoe's motion for a preliminary injunction, is AFFIRMED.