ANGELO, GORDON & CO., L.P., JMG Capital Partners, LLC, Sagamore Hill Hub Fund, Ltd., JMG Triton Offshore Fund, Ltd., Peninsula Capital Advisors, LLC, Guardfish LLC, and Anda Partnership, Plaintiffs,

v.

ALLIED RISER COMMUNICATIONS CORPORATION, a Delaware corporation, Gerald K. Dinsmore, R. David Spreng, Donald Lynch, and Blair P. Whitaker, Defendants.

C.A. No. 19298.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 28, 2002.
Decided: Jan. 30, 2002.

Donald J. Wolfe, Jr., Esquire, Kevin R. Shannon, Esquire, Rebecca L. Scalio, Esquire, Potter Anderson & Corroon, Wilmington, Delaware; and Dale C. Christensen, Jr., Esquire (argued) and John J. Galban, Esquire, Seward & Kissel LLP, New York, New York; Attorneys for Plaintiffs.

Allen M. Terrell, Jr., Esquire (argued), Thad J. Bracegirdle, Esquire, Andrea K. Short, Esquire, Richards, Layton & Finger, Wilmington, Delaware; and Patricia J. Villareal, Esquire, Thomas R. Jackson, Esquire, Jones, Day, Reavis & Pogue, Dallas, Texas; and Geoffrey S. Stewart, Jones, Day, Reavis & Pogue, Washington, D.C.; Attorneys for Defendants.

## MEMORANDUM OPINION

LAMB, Vice Chancellor.

This is a request for a preliminary injunction against a merger between two telecommunications companies brought by the creditors of one who claim that the transaction is a breach of contractual duties owed to them under the terms of the notes they hold. In addition, they claim that the directors of the allegedly insolvent company have breached their fiduciary duties by authorizing and recommending the merger on terms that are unfair to the noteholders. For the reasons that follow, the motion for a preliminary injunction is denied.

### I.

Plaintiffs bring this motion to preliminarily enjoin the proposed merger (the "Merger") of defendant Allied Riser Communications Corporation, a Delaware corporation with its principal place of business in Dallas, Texas (the "Company" or "ARC"), with Cogent Communications Group, Inc. ("Cogent"), a Delaware corporation with its headquarters in Washington, D.C.[1]

---

1. Under the terms of the Merger, ARC will merge with a wholly owned subsidiary of Co-

Plaintiffs are investment entities that own, or manage accounts that beneficially own, (collectively, with others not party to this action, the "Noteholders") $72.7 million of 7.5% Convertible Subordinated Notes outstanding and due in 2007 (the "Notes"), representing 59% of the $123.6 million face amount of Notes that remain outstanding. The Notes were issued pursuant to an indenture dated June 28, 2000 (the "Indenture") between ARC, as issuer, and Wilmington Trust Company, as indenture trustee (the "Trustee"). The Indenture is governed by New York law. The Notes are convertible into ARC stock at a price of $15.37 per share. The Notes are not, and never were, investment grade debt instruments.[2] Currently, the Notes trade at a deep discount to their face value.

Defendant Gerald K. Dinsmore is the CEO and Chairman of the Board of ARC. Defendants R. David Spreng, Donald Lynch, and Blair P. Whitaker are outside members of the Company's board.

ARC is a facilities-based provider of broadband data, video, and voice communications. Starting in June 1997, the Company's business plan was to install in office buildings in the U.S. and Canada the infrastructure necessary to carry voice and data traffic and other services, such as conference calling. By June 2000, the Company had agreements with real estate owners and developers to install and operate its networks in over 1,250 office buildings. Due to the significant up-front cost of wiring each building, and the extremely competitive nature of the market for communications services, it was clear from the beginning that the Company would take many years to turn a profit, if indeed it ever did.

ARC has made all interest payments to date on the Notes. Because they are balloon obligations, no payment of principal is required until 2007 unless one of several provisions in the Indenture is triggered that would cause the Notes to become due and payable before that time. Among such triggers provided for in the Indenture are (i) a voluntary or involuntary bankruptcy filing,[3] (ii) failure to pay interest,[4] and (iii) default in the performance of any covenant or warranty.[5] There is no claim before this Court with regard to the first two categories. Plaintiffs do claim that ARC has breached the covenant to "keep in full force and effect its existence, rights (charter and statutory) and franchises ...,"[6] thus triggering an event of default and accelerating the principal payment obligation on the Notes.

Noteholders can also acquire the right to force ARC to repurchase the Notes at par should a change of control of the Company occur that does not meet certain tests defined in the Indenture. Specifically, the Indenture requires ARC to provide notice to Noteholders within 45 days of a non-qualified change of control occurring.[7]

gent, with ARC being the surviving entity.

**2.** The relatively low coupon, coupled with the substantial absence of protective financial covenants, suggests that the convertibility feature of the Notes—affording the Noteholders a substantial equity play—was an important element of value when these instruments were sold.

**3.** Ex. D, Indenture § 5.1(7)

**4.** Ex. D, Indenture § 10.1

**5.** Ex. D, Indenture § 10.4

**6.** *Id.*

**7.** "Unless the Company shall have theretofore called for redemption all of the Outstanding Securities, on or before the 45th day after the occurrence of a Change of Control, the Company or, at the request and expense of the Company on or before the 15th day after such occurrence, the Trustee, shall give to all Holders of Securities, in the manner provided in

After receiving this notice, the Noteholders then have the option to "put" their Notes to the Company under terms set forth in the Indenture.[8]

The Indenture excludes from the definition of "change of control" a merger in which the consideration paid to ARC stockholders "consists of shares of common stock traded on a national securities exchange ... or [that] will be so traded ... immediately following the merger or consolidation ..." if the Notes become convertible "solely into such common stock."[9] Plaintiffs claim that the Merger will not meet the terms of this exclusion. If they are correct, they would then have the right to "put" their shares to the Company.

For the nine months ended September 30, 2001, ARC had a net loss of $374.1 million. This extraordinary loss precipitated a write-down of its assets that resulted in ARC's insolvency. Since the Merger was announced, ARC has negotiated a workout of debt senior to the Notes with Cisco Systems Capital Corp. Nevertheless, on a balance sheet basis, it remains insolvent.[10]

In June 2000, ARC's common stock was trading at approximately $15 per share. By September 2000, the share price had dropped below $10. Since April 2001, ARC common stock has traded below $1 per share. At present, it trades in the 15 to 20 cents per share range.

In July 2001, the Company hired Houlihan Lokey Howard & Zukin ("Houlihan Lokey") to review its business and suggest strategic alternatives. That same month, the Company announced it was suspending its retail business in the U.S. and reducing its workforce by 75% within weeks. The Company thereafter sold most of its operating assets.

Cogent contacted ARC on August 4, 2001 concerning the possibility of a strategic relationship between the two companies. The parties signed a confidentiality agreement and proceeded to explore the potential for an alliance and possible structural scenarios. By August 10, 2001, the discussions had reached a point where

Section 1.6, notice (the "Company Notice") of the occurrence of the Change of Control and of the repurchase right set forth herein arising as a result thereof and the Company shall issue a press release including the information required to be included in such Company Notice hereunder." Ex. D, Indenture § 14.3.

8. "In the event that a Change in Control ... shall occur, then each Holder shall have the right, at the Holder's option ... to require the Company to repurchase, and upon the exercise of such right the Company shall repurchase, all of such Holder's Securities not theretofore called for redemption .... on the date (the "Repurchase Date") that is 45 days after the date of the Company Notice ... at a purchase price equal to 100% of the principal amount of the Securities to be repurchased plus interest accrued to the Repurchase Date." Ex. D, Indenture § 14.1.

9. Ex. D, Indenture § 14.4(2).

10. The defendants' financial expert suggests that, in judging insolvency under a balance sheet test, it is appropriate to value the Notes at 40% of their face value, to reflect the discounted prices at which they trade. I disagree. Certainly, it is appropriate to fair value assets. But it cannot ordinarily be true that one should mark debt to market unless the Company has a right to reacquire that debt at that price. Otherwise, companies could always avoid insolvency by the simple device of marking down the face amount due on their publicly traded debt to a market price driven by the company's own financial distress. This is unlike the situation, sanctioned by decisions of this State, of reducing debt to its present value as, for example, where an issue of long-term debt carries a particularly favorable coupon. *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911 at 9–10, 1995 Del. Ch. LEXIS 75 at *27 (Del. Ch.).

ARC's board was advised of the possible transaction. The board, after being updated on the general parameters of the discussions, authorized management to proceed with negotiations. Houlihan Lokey was asked to assist management in conducting the required due diligence of Cogent.

The Board met again on August 12, 2001 to review the current state of the negotiations with Cogent. During the course of that meeting, the Board discussed other strategic alternatives that were available to the Company, including potential resolutions with creditors, potential liquidation alternatives, and other strategies. The board authorized management to continue its discussions of a possible merger with Cogent.

Following additional due diligence by both companies, the ARC board met again on August 20, 2001. At that meeting, the board formally authorized the retention of Houlihan Lokey to serve as the Company's financial advisor in connection with the potential merger with Cogent. The board discussed the current state of the terms for such a merger and authorized management to continue the discussions.

On August 27, 2001, the Company's board met to consider the terms of a merger agreement that management had negotiated. At that meeting, Houlihan Lokey made a presentation relating to various strategic alternatives available to the Company, including potential bankruptcy and liquidation scenarios and the proposed Cogent merger. After some discussion, the board requested additional information from Houlihan Lokey regarding the combined entity's ability to meet its obligations and the value available to all of ARC's various constituencies upon consummation of the Merger.

The board met again the next day, August 28, 2001, to hear Houlihan Lokey's full presentation regarding its financial analysis of the proposed combination with Cogent. After a full discussion of a variety of issues, Houlihan Lokey orally informed the board that in Houlihan Lokey's opinion the merger and the exchange of ARC shares were fair to ARC stockholders from a financial point of view and fair to ARC's creditors (on an aggregate basis) from a financial point of view. Houlihan Lokey's opinion was later confirmed in writing. The board held additional discussions on the transaction, and then unanimously approved the Merger agreement. The Merger agreement was executed by each company and publicly announced the following morning.

Following that board meeting, Cogent and the Company renegotiated several terms of the transaction in light of the changes that occurred at both companies since the signing of the Merger agreement. Those discussions led to an amendment to the Merger agreement in which the amount of Cogent stock to be received by ARC's stockholders increased, specific deadlines were established for completion of various tasks, and ARC was permitted to increase the amount of cash it could use in the fourth quarter of 2001. On October 10, 2001, the board met to consider the proposed amendment. The board considered the terms of the amendment proposal, the financial condition of each company, the status of the reduction in ARC's long term liabilities and the alternatives available. After Cogent also agreed to add a prohibition on effecting a going-private transaction for six months after the Merger, both Cogent and ARC executed the amendment on October 13, 2001.

Under the terms of the agreement as amended, ARC will merge with a wholly owned subsidiary of Cogent and will be the surviving entity. As a consequence of the Merger, ARC will become a wholly owned subsidiary of Cogent. Upon completion of

the Merger, each ARC share of stock will be converted into the right to receive 0.0321679 shares of common stock of Cogent.

The board believes that the holders of the Notes, including the plaintiffs, will be better off under the newly combined Cogent entity. As Dinsmore put it, "the ability to make interest payments and return principal are only enhanced through the merged entity."[11] The Company terminated Houlihan Lokey's services on October 29, 2001[12] and Houlihan Lokey was never asked to update its August 28, 2001 fairness opinion.

Defendants assert that when considering whether to request an updated opinion, the board determined that paying Houlihan Lokey to conduct that additional analysis was neither required nor prudent. The defendants also argue that the board examined each of the issues raised by Houlihan Lokey and concluded, based on the totality of the information relating to the Company and Cogent, that the merger was positive for all of ARC's stakeholders. Dinsmore testified that Houlihan Lokey did not have all of the facts about Cogent that were in the possession of ARC's board at the time Houlihan Lokey raised its concerns:

Q. Doesn't that cause you concern that your investment advisor is questioning whether their fairness opinion really is adequate in light of these developments, and yet you're relying on the earlier opinion at this point?

A. The answer to that is no, because point number one, the significant reduction in Cogent's series C financing, as I already explained, was supplemented through the 100 million dollars of additional financing. Number two, Cogent's acquisition of NetRail that was a use of cash but also had a strategic enhancement to combined merger. Point number three, Cogent's extreme variance in actual performance, as I've already explained, we confirmed that they [Cogent] have got themselves on their plan. So no, because this is an after-the-fact document that doesn't have all of the relevant facts.[13]

Cogent is a facilities-based Internet service provider of high-speed Internet access to business. Cogent was founded in August 1999, and has generated net losses of $57.3 million since its inception through September 2001. As of September 30, 2001, Cogent had total assets of $247 million including $115 million in stockholder equity. Cogent also has a substantial debt facility with Cisco Systems Capital Corp.

---

11. Dinsmore Deposition Transcript, p. 56.

12. Despite the termination of its services, Houlihan Lokey has participated in the review of the registration statement on Form S–4 submitted to the Securities and Exchange Commission in November 2001. It has since, through its counsel, raised some issues with the S–4's description of Houlihan Lokey's opinion and role on behalf of the Company. Specifically, Houlihan Lokey notes "[a]lthough Houlihan has not concluded any analysis of events occurring following August 28, 2001, it believes that its ability to deliver such an opinion would have been adversely effected [sic] by several material events that occurred after August 28, 2001." Houlihan Lokey raised three issues: (1) the reduction in Cogent's Series C financing from $130 million to $65 million; (2) Cogent's acquisition of NetRail; and (3) Cogent's failure to meet is projected financial performance. At deposition, Houlihan Lokey's representative testified that Houlihan Lokey would need to conduct additional analysis before it determined whether the events described in this correspondence would lead to a different conclusion as to the fairness of the amended Cogent merger.

13. Dinsmore Testimony pp. 109–110.

As a result of the Merger, the Notes would (i) stay in place, (ii) Cogent would execute a Supplement Indenture making itself an additional Obligor on the Notes, and (iii) Cogent's creditors would get a security interest in all of ARC's assets, including its cash. In effect, the Notes would become subordinated debt in the combined entity.

On December 7, 2001, the Noteholders filed a verified complaint alleging breach of fiduciary duty, breach of covenants of good faith and fair dealing, fraudulent conveyance, and constructive trust. The Noteholders also provided ARC and the Trustee with "Notice of Default" under the Indenture and commenced negotiations to have the Trustee join in the prosecution of the Noteholders' claims. In early January 2002, the Trustee decided not to prosecute the claims presented to it and communicated that determination to plaintiffs.

A January 3, 2002 amendment to Cogent's Form S–4 announced a January 31, 2002 meeting of shareholders for the purpose of voting for the merger. Plaintiffs filed a verified amended complaint on January 11, 2002, adding claims for breach of the Indenture. On January 14, 2002, plaintiffs moved for a preliminary injunction.

## II.

Preliminary injunctive relief will be granted only where the moving party demonstrates (1) a reasonable probability of success on the merits, (2) irreparable harm if the injunction is not granted, and (3) a balance of equities in favor of granting the relief.[14] Moreover, a preliminary injunction is an extraordinary remedy, which will not issue unless it has been earned and will be denied where the remedy sought is excessive in relation to, or unnecessary to prevent, the injury threatened.[15] The extraordinary remedy "is granted only sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[16]

### A. Likelihood of Success on the Merits

Plaintiffs knew in early December that the Merger was due to close by January 31, 2002, yet they waited until January 14 to file their motion for preliminary injunction. As a result, although this court is often required to rule quickly on significant matters, the amount of time available to consider the record and arguments in this case has been unusually truncated.

Preliminarily, it appears that the claims asserted under the Indenture are either not meritorious or not a basis for issuing injunctive relief.[17] First, I conclude that there is not a substantial likelihood that plaintiffs will prevail on their "de facto liquidation" claim that ARC's sale of assets

---

**14.** *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361, 1371 (Del.1995); *SI Management L.P. v. Wininger,* 707 A.2d 37, 40 (Del. 1998); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del.1986).

**15.** *Ivanhoe Partners v. Newmont Mining Corp.,* 533 A.2d 585, 600 (Del.Ch.1987), *aff'd,* 535 A.2d 1334 (Del.1987).

**16.** *Cantor Fitzgerald LP v. Cantor,* 724 A.2d 571, 579 (Del.Ch.1998).

**17.** Defendants challenge plaintiffs' standing to assert claims under the Indenture as to which, they say, proper demand has not been made on the Trustee under Section 5.7 of the Indenture. In view of my denial of the injunction, I do not reach this issue other than to note that, at least as to the claims articulated therein, the December 7, 2001 letter to the Trustee would appear to satisfy this objection.

and contraction of business operations has amounted to a violation of the covenant in Section 10.4 of the Indenture entitling them to remedies in default. On the contrary, the record suggests that ARC has, in all respects, met the terms of this modest covenant.[18] Second, it is unclear at this point whether the Merger will result in a non-qualified change of control or not. The answer to this question will turn on whether Cogent succeeds in listing its common stock on the AMEX as it claims it will do. In any case, a non-qualified change of control does not violate the Indenture but, rather, gives rise to a right to "put" the shares to ARC at face value plus accrued interest. Thus, that a "change of control" may occur does not warrant the entry of an injunction. Finally, I am unable to conclude from the record now before me that the proposed execution of the Supplemental Indenture by Cogent without the consent of the Noteholders will amount to a violation of the Indenture of the Noteholders' voting rights.[19]

The claims arising out of ARC's condition of insolvency may be more substantial, but the legal framework for their analysis is much less clear. It is a commonplace to say that the directors of ARC (due to its balance sheet insolvency) owed a fiduciary duty to the Noteholders in considering the authorization of the Merger.[20] It is a more difficult proposition to apply that legal precept to the facts presented in this case.

For example, plaintiffs argue that since the defendant directors either own or represent 28% of the common stock of ARC and do not have a similar interest in the Notes, they are "interested" in the Merger and their actions are not entitled to the presumptions of the business judgment rule.[21] Defendants respond that they own or control 3.5% of the common stock, the value of which is insignificant, both to them and absolutely. They also argue that the protection of the business judg-

---

**18.** The record reflects that throughout the process of changing its business plan and negotiating with its creditors, ARC had taken all necessary steps to remain in existence. ARC has remained a corporation in good standing, retained its licenses to operate, and maintained the agreements granting its rights to operate in the various buildings where its equipment was installed. This conclusion also leads me to reject the dependent argument that the merger is prohibited by Section 7.1(2) of the Indenture due to the default under Section 10.4 resulting from the claimed "de facto liquidation."

**19.** Plaintiffs' argument is premised on the fact that neither Section 8.1 ("Supplemental Indentures Without the Consent of Holders of Securities") nor Section 8.2 ("Supplemental Indenture with Consent of Holders of Securities") contemplates the execution of a Supplemental Indenture by a person, such as Cogent, that is not the surviving entity of a merger with ARC. Because the proposed merger will be accomplished by merging a subsidiary of Cogent with and into ARC, with ARC as the surviving company, plaintiffs con-

tend that no Supplemental Indenture is permitted by the Indenture. Whether this is an accurate reading of the Indenture or not, the fact that Cogent will sign a Supplemental Indenture and become an additional Obligor on the Notes threatens no injury to the plaintiffs.

**20.** *McDonald v. Williams*, 174 U.S. 397, 404–5, 19 S.Ct. 743, 43 L.Ed. 1022 (1899); *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del.Ch.1992); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corporation*, 1991 WL 277613, at *33–36, 1991 Del. Ch. LEXIS 215, at *108 (Del. Ch.).

**21.** Notably, plaintiffs do not allege that the terms of the Merger, taken as a whole, amount to a fraudulent transfer as against the Noteholders. Delaware statutory law, like that of other States, proscribes transfers that are in fraud of creditors, DEL. CODE ANN. tit. 6, §§ 1301 *et seq.* (1999), and provides a standard against which to judge such transactions. Plaintiffs specifically eschew reliance on that body of law.

ment rule is available to them, relying on one opinion applying the rule to directors of a corporation engaged in a statutory dissolution [22] and on another that implicitly applied the rule to a decision of directors of an insolvent corporation that was challenged by the stockholders.[23] Defendants also argue, based on the authority of a case involving a solvent corporation in which the directors were required to approve a transaction which implicated the conflicting interests of different classes of stock, that the Noteholders must shoulder an initial burden of showing that the directors' conflicted interest was so substantial "as to [make] it improbable that the director[s] could perform [their] fiduciary duties to the [plaintiffs] without being influenced" by an overriding and antagonistic personal interest.[24]

My preliminary view is that, even where the law recognizes that the duties of directors encompass the interests of creditors, there is room for application of the business judgment rule. Thus, I tentatively conclude that, to overcome the presumption of regularity attending the application of the business judgment rule,[25] plaintiffs must carry an initial burden of showing circumstances supporting an inference that the directors did not act in good faith after a reasonable investigation. On the record before me, they have not met this burden

with respect to the directors' financial interests.[26]

In addition to arguing that the directors' interests as shareholders conflicted with the Noteholders', plaintiffs advance the proposition that the structure and business prospects of the resultant entity are so risky as to support a conclusion that the directors were not acting in good faith with respect to the Noteholders in entering into the Merger agreement. On the preliminary record before the court, I am unable to conclude with a degree of confidence that plaintiffs have shown a likelihood of success on the merits of this argument. In reaching this conclusion, I acknowledge that the recent correspondence between counsel for Houlihan Lokey and ARC regarding the adequacy and completeness of the disclosures in the Cogent Form S–4 relating to the Houlihan Lokey opinion letter [27] poses concerns as to the fairness of the transaction as a whole. Nevertheless, Houlihan Lokey has not withdrawn its fairness opinion nor has it told ARC that it may no longer rely upon it. In addition, the deposition testimony of Dinsmore provides support for a conclusion that ARC's directors, acting in good faith and after reasonable investigation, considered the changes in Cogent's business and prospects identified by Houlihan Lokey and satisfied them-

---

**22.** *In re RegO Co.,* 623 A.2d 92, 109 at n. 35 (Del.Ch.1992).

**23.** *Odyssey Partners, L.P. v. Fleming Cos.,* 735 A.2d 386, 420 (Del.Ch.1999).

**24.** *In re GM Class H Shareholders Litig.,* 734 A.2d 611, 617 (Del.Ch.1999).

**25.** *See, e.g., Cinerama, Inc. v. Technicolor,* 663 A.2d 1134, 1153 (Del.Ch.1994).

**26.** Even if I were to apply a more stringent standard, however, it is unclear what measure of fairness or good faith should govern the conduct of these directors in relation to the Noteholders. These subordinated convertible

debt securities: (i) do not appear to be in default, and (ii) neither contain typical covenants relating to ARC's financial performance nor impose any substantial restrictions on ARC's freedom to incur debt or to enter into transformative business transactions. Would a fiduciary duty-based standard require directors, in effect, to treat the Notes as if they were in default when they were not or as if they contained stronger covenants than they do? I think the answer is likely not, and plaintiffs cite no authority to the contrary.

**27.** *See* note 12, *supra.*

selves that the Merger continued to be fair to all interests concerned. In the context of this preliminary injunction, I am not prepared to conclude otherwise.

## B. Irreparable Harm and the Balance of Equities

Even if plaintiffs had shown a reasonable likelihood of success on the merits of their application, I would be unable to conclude that they have shown the existence of a threat of imminent, irreparable harm.

Plaintiffs advance several reasons why it is necessary to enjoin the Merger in order to prevent irreparable injury to them:

- The practical effect of the Merger will be to subordinate the Notes to Cogent senior debt "at levels never contemplated when the Noteholders purchased the Notes from Allied Riser."
- The Merger (and the supplemental indenture) "effectively alters the fundamental nature of the debtor-creditor relationship envisioned by the Indenture and contemplated by the Noteholders when they purchased the Notes."
- ARC's insolvency and the anticipated level of cash expenditures by Cogent will prevent the Noteholders from collecting "any judgment for money damages rendered in the[ir] . . . favor" on their claims for breach of the covenant contained in Section 10.4 or for a triggering of the Change of Control provisions.

In their reply brief, plaintiffs advance several more arguments in favor of a finding of irreparable harm. First, they focus on the revised Supplemental Indenture, arguing that it may not be entered into without their consent. They argue that the "Court should enjoin Defendants' improper attempt to deprive the Noteholders of their right to vote on the proposed change to the Indenture in connection with the Merger," relying on cases that stand for the proposition that the "loss of voting power constitutes irreparable injury."[28] Second, they reiterate their argument about the inadequacy of money damages in light of the likely dissipation of ARC's funds into Cogent's operation.

As a result of the Merger, the Notes will become, in effect, subordinated debt of Cogent. This is so because the terms of the Cisco Systems Capital Corp. loan agreement with Cogent will require ARC to execute and deliver a guarantee and security agreement to Cisco immediately after the Merger. However, this result has not been shown to be inconsistent with the contractual terms of the Notes. Indeed, as discussed above, the Indenture expressly subordinates the Notes to an unlimited amount of senior indebtedness and permits ARC to engage in certain mergers, even ones in which ARC is the acquired party, without requiring repayment of the Notes. Thus, it is unclear that there is anything inherently harmful in the prospect of the Notes being treated as subordinated debt in the resulting enterprise, even if there will be more senior debt than currently exists in the ARC financial structure.

I recognize that there will be potentially more enterprise risk after the Merger than there is now within ARC itself and that this additional risk poses some greater threat to the due performance on the Notes. That is so because ARC, having sold most of its operating assets and drastically cut expenses, has scaled back its

---

**28.** See, e.g., Phillips v. Insituform of North America, Inc., 1987 WL 16285 at *11, 1987 Del. Ch. LEXIS 474 at *33 (Del. Ch.)

operating units and is sitting on a pot of cash. But it would be a fallacy to judge the fairness of the Merger to the Noteholders based on the current situation at ARC unless the Company were also obliged either to maintain the status quo or to return the Noteholders' money to them. There is no such requirement in the Indenture, and plaintiffs do not even argue that ARC's insolvency reduces its options so severely.[29] Thus, I am unable to agree with plaintiffs' claim that the Merger alters the fundamental nature of the relationship between debtor and creditor.

It is, of course, possible that the Cogent/ARC Merger will not prove to be a profitable enterprise and, as plaintiffs suggest, will not be able to pay damages if plaintiffs obtain a money judgment in this action. Moreover, given the history of both companies over the past couple of years, it is not surprising that plaintiffs (who have evidently grown more risk averse since the Notes were first issued) find this prospect both likely and threatening. Nevertheless, I cannot conclude that this possibility alone justifies the entry of an injunction against the Merger because the injury it contemplates is both speculative and will not result from the Merger itself but will only be felt, if at all, with the passage of time after the Merger. To address the problem, I will entertain an application by the plaintiffs for an expedited trial schedule. In that way, if there are viable claims for monetary damages, they can be resolved and reduced to judgment within a relatively short period of time after the Merger.

Finally, while this court is always solicitous of voting rights, I am unable to conclude that the proposed Supplemental Indenture by which Cogent will agree to become liable on the Notes as an additional Obligor threatens the Noteholders with any harm at all. At oral argument, I asked plaintiffs' counsel to provide some explanation of why it would be injurious to the rights of the Noteholders to have a second Obligor; he was unable to provide a reason. Similarly, I fail to understand how becoming an additional Obligor under the Indenture affords Cogent any rights at the expense of, or is otherwise detrimental to, the Noteholders. Instead, it appears that the Noteholders will be better off after the Merger if both ARC and Cogent are obligated on the Notes and the Indenture. Thus, even if a technical reading of the Indenture supported the plaintiffs' position on this issue, which it does not, I am unable to agree that the execution of the Supplemental Indenture poses a threat of irreparable harm.

By contrast, there is a clear threat of irreparable harm to ARC and its stockholders in the event the transaction is enjoined and Cogent terminates the merger agreement. There is no other transaction currently available to the ARC stockholders and no other clear business strategy for ARC to pursue. ARC and Cogent both have devoted considerable time and effort to the proposed Merger, all of which would be wasted should an injunction result in the abandonment of the transaction. While it is uncertain whether Cogent would terminate the agreement, that is a risk to

---

29. The record also does not support the Noteholders' claim that the resultant enterprise will be measurably riskier than was ARC itself when the Notes were sold in 2000. At that time, ARC was a new company with an unproven track record proposing to operate in the completely new business of providing connectivity to the Internet. Its current lack of financial fitness is due to its heavy expenditures on capital investment and the collapse of the larger market in which it was operating. The former was part of the original business plan and the latter a clear risk at the time these Notes were issued.

which ARC and its stockholders should not lightly be exposed.

Balancing the interests of the parties, I am satisfied that the equities weigh against the entry of an injunction.

### III.

For the foregoing reasons, the motion for preliminary injunction shall be and hereby is DENIED. IT IS SO ORDERED.