MEMORANDUM OPINION
Grand Metropolitan Public Limited Company ("Grand Met"), a company incorporated in England, organized in that Country, a wholly owned subsidiary, Wendell Investments Limited ("Wendell"), as a vehicle through which Grand Met seeks to acquire The Pillsbury Company ("Pillsbury"), a Delaware corporation. Grand Met and Wendell are plaintiffs and I will refer to them in the singular as "Grand Met." Together they own 200 shares of Pillsbury.
On October 3, 1988, Grand Met filed this action seeking declaratory and injunctive relief against Pillsbury and joined its directors as defendants. I will refer to defendants collectively as "Pillsbury."
Certain shareholders of Pillsbury filed separate actions against the Corporation, the purpose of which is to support Grand Met's effort to acquire Pillsbury. I will refer to them as the "shareholder-plaintiffs." All actions were consolidated by an order of this Court.
Grand Met's present motion for a preliminary injunction seeks an order, (a) directing Pillsbury to redeem certain preferred stock purchase rights (the "Rights") associated with its "Stockholder Rights Plan" (the "Poison Pill"); and (b) enjoining Pillsbury from implementing its announced spin-off (the "spin-off") of Burger King Corporation ("Burger King").
The shareholder-plaintiffs have also moved for a preliminary injunction, (a) directing defendants to redeem the Rights; and (b) enjoining defendants from taking any steps to spin-off the common stock of Burger King or to cause Burger King to pay any special dividend.
This is the decision on both aspects of the separate motions.
 I.
Grand Met is a holding company with a wide range of interests and investments which include brewing and retailing, consumer services, oil and gas products, consumer products, hotels, food, spirits and wine. In 1987, it had sales of approximately $10.17 billion. According to one investment banker, Grand Met is the largest spirits company in the world, the second largest *Page 1051 
wine company in the United States, the third largest brewer in the United Kingdom and the third largest dairy company in the United Kingdom.
Pillsbury is a diversified international food and restaurant company. It is engaged in the manufacture of branded dry groceries, refrigerated fresh dough, frozen and canned products and bakery mixes; it mills flour, grain and feed ingredients; and it has supporting storage, distribution and transportation systems for its products. Pillsbury also owns restaurant operations, including Burger King, Bennigan's, and the Steak 
Ale facilities.
In the early or mid-1980's, the value of Pillsbury's diversified businesses exceeded the market value of its common stock, which is publicly traded, and thus it became a tempting takeover target. In about 1986, Pillsbury's earnings, gross margins and return on equity began to decline and significant changes were made in high level management. All of that was reflected in relatively depressed prices of its stock. This scenario attracted the active attention of at least one would-be investor which found unrealized value in Pillsbury, namely, Grand Met.
Pillsbury's focus on its internal problems did not blind the Company to the possibility that the "low" price of its stock and a potentially prosperous future made it an even more alluring target. Pillsbury took notice of what was happening and, indeed, served notice that it would fight any attempt at takeover. In June 1988, William H. Spoor, then Chairman, President and Chief Executive Officer of Pillsbury, was quoted as saying, "If you want to see a hell of a cat and dog fight, just let someone make a move on us."
Two years before any of this began, the Pillsbury Board of Directors had adopted, in January 1986 (without stockholder approval), a Stockholder Rights Plan which included a Poison Pill;[2] other "defenses" put in place included the creation of alternating terms for its directors, a prohibition of stockholder action by written consent, a limitation on who may call a meeting of stockholders, and a "supermajority/fair price" amendment to the corporate charter requiring approval of 80% of the outstanding voting stock to authorize any "business combination transaction" not approved by the Board of Directors.
At some time during May 1988, Pillsbury became aware of Grand Met's interest. That interest was floating on rumor and thus Pillsbury did not know the price nor the terms of any offer. But, acting on the old principle that a strong offense is the best defense, Pillsbury found in its own operations a basis for affirmative action. The Pillsbury restaurants (including the Steak Ales and Bennigan's) serve, not food alone; they also serve alcoholic beverages. And Grand Met is a manufacturer of alcoholic beverages. A number of States in which Pillsbury operates restaurants have so-called, "Tied-House" Statutes, the general sense of which is to prohibit a manufacturer of alcoholic beverages from owning or having an interest in a distributorship or a retail outlet. Would such a Statute prohibit Grand Met from acquiring Pillsbury? *Page 1052 
During or before September 1988, Pillsbury began communicating with State Alcoholic Beverage Commissions about Tied-House relationships. The purpose, of course, was to stop or divert any bid by Grand Met. And on the day on which Grand Met's Offer was announced, Pillsbury sued Grand Met in 14 jurisdictions, apparently alleging violations of the Tied-House laws.
On October 4, 1988, Grand Met began a fully financed Tender Offer for all common stock of Pillsbury.[3] The aggregate value of the Offer is about $5.5 billion. The price offered: $63 per share.[4] The terms: all cash. The scope of the Offer: all outstanding shares. The Offer includes several conditions, the most significant of which is (for present purposes) redemption of the Rights by the Pillsbury Board, or other effective invalidation which would make them inapplicable to the Tender Offer and any subsequent merger or consolidation between Pillsbury and Grand Met. Grand Met's stated purpose is to acquire all equity interest in Pillsbury, for $63 per share in cash.
At $63, the per share price is about 60% more than the closing price of Pillsbury on the New York Stock Exchange on September 30. That price was about $39. The stock had traded in a $28 to $48 7/8 range during the fiscal year which ended on May 31, 1988.
On the day on which the Tender Offer was commenced, the Chief Executive of Grand Met's operations in the United States wrote to Mr. Smith, Pillsbury's Chairman, saying, in part, "The Board of Directors [of Pillsbury] should be aware that we are prepared to enter into negotiations immediately with respect to all aspects of our proposal, including price."[5]
On October 17, the Board of Directors of Pillsbury met and, by unanimous vote of all present, determined that Grand Met's Offer was inadequate and not in the best interest of the Company and its stockholders, and recommended against acceptance and declined to redeem the outstanding Rights.
Thereafter, all plaintiffs moved for a preliminary injunction which the Court denied by letter opinion dated November 7. But any party was authorized to make further application to the Court, including renewal of the respective motions for a preliminary injunction. Such motions were filed and, after additional discovery, briefing and argument, were submitted for decision.
 II.
First, as to the standards governing plaintiffs' motions for injunctive relief.
Delaware law is settled, and clear, on the burden which must be carried by one who seeks relief at this stage in the litigation.
To obtain a preliminary injunction, a plaintiff must show that it has (a) a reasonable probability of success on the merits, that (b) it will suffer irreparable harm if relief is denied and that (c) any such harm outweighs any harm a defendant will suffer if relief is granted. Ivanhoe Partners v. NewmontMining Corp., Del.Supr., 535 A.2d 1334, 1341 (1987); Revlon,Inc. v. MacAndrews Forbes Holdings, Inc., Del. Supr.,506 A.2d 173, 179 (1986). See also City Capital Associates LimitedPartnership v. Interco Incorporated, Del. Ch. , 551 A.2d 787, 795
(1988).
The motions for an order directing defendants to redeem the Pill seek mandatory relief and to secure that, short of a final hearing, it must be shown that the legal right to be protected is clearly established. *Page 1053 Steiner v. Simmons, Del. Ch. , 111 A.2d 574 (1955).
 III.
Second, as to the Tied-House Statutes.
I have already referred to Pillsbury's efforts to thwart Grand Met's bid by invoking the Statutes of certain States which prohibit a manufacturer of spiritous liquors from having an interest in a retail outlet or a distributorship. Such a Statute may bar Grand Met (as a manufacturer) from having an interest, through its shares in Pillsbury, in the Bennigan's and Steak 
Ale restaurants which sell and serve alcoholic beverages to their customers.
The shareholder-plaintiffs argue that the use of such Statutes, by lawsuits and lobbying, is but a "knee-jerk" response to the Tender Offer and would have been initiated no matter what price Grand Met had offered.[6]
The briefs and the record indicate that the status of the litigation and related proceedings in the dozen or more States involved varies from State to State. The results reached in each of those cases will depend on local law and, as I stated in the November 7 opinion, the decisions as to the possible application of the respective Statutes should be left to the States involved. I do note, however, that Grand Met has promised in its Tender Offer that, if it acquires Pillsbury, it will divest itself of liquor-serving restaurants, in compliance with the liquor control laws of the States involved. And there appears to be precedent for such a procedure — that is, a divestiture procedure has been used by other companies to avoid a conflict with Tied-House Statutes and, indeed, Pillsbury itself used such a procedure on a prior occasion when it acquired the Steak Ale restaurants.
I make no judgment as to whether Pillsbury's action was a reasonable response to the Tender Offer. As the briefs with respect to the Tied-House Statutes show, a persuasive argument can be made for each side of the controversy. But I do not view the dispute over the Statutes as material to the question of whether or not the Rights should be redeemed, and that is the dispositive issue presented now. And, in any event, as I also ruled in the November 7 opinion, plaintiffs have not shown that irreparable harm will result if relief is denied on this issue.Ivanhoe Partners at 1341. In short, I decline to enter an order barring Pillsbury from proceeding with whatever litigation it initiated under the Tied-House laws.
 IV.
Next, I turn to the central issue in the case: What is to be done about the Pill? Shall it remain in status quo and thus a legal and financial barrier to Grand Met and, consequently, an immovable road block to the Pillsbury stockholders who would tender in? Or, should the Pillsbury Directors, who alone put the Pill in place, be ordered to remove it so that their stockholders may have a free choice to accept or refuse the Tender Offer?
Before discussing this issue, I briefly state the contentions of the parties.
Grand Met contends that the refusal of the Pillsbury Directors to redeem the Pill violates the very fundamental rule of corporate governance and democracy, that is: the corporation is owned by its stockholders and the Board (and management) act as fiduciaries on behalf of the stockholders. As applied here, Grand Met argues that the Court should not permit the Pillsbury Board to foreclose the stockholders from choosing to sell their shares into the Tender Offer, unless it can be said that the Offer represents a palpable threat to stockholder welfare. And, continues Grand Met, there is no such threat here.
Like their co-plaintiff, the shareholder-plaintiffs argue that the principles of corporate democracy are at stake and the public stockholders should be permitted to exercise their franchise to sell their respective *Page 1054 
shares, if they so elect. Then, relying on Interco, they say that, as to the Pill, the Court should mandate redemption now. And they contend that the adequacy of the $63 per share offer has been established by an effective probe of the market.
Pillsbury responds to those contentions by saying that the standards for injunctive relief, mandatory and restraining, have not been met by plaintiffs. Specifically, Pillsbury argues that its Board has met, in all respects, its duties under Delaware law; it says that its decision to keep the Pill in place was made in good faith, by independent directors, after a reasonable investigation, and to protect the corporation from harm reasonably perceived. Consequently, Pillsbury continues, the Board's decision is protected by the business judgment rule and that its response was reasonable in relation to the threat posed.
Pillsbury also contends that Grand Met's Tender Offer of $63 per share is not adequate and that the Board's commitment to long-term corporate values will provide significantly more benefit to its stockholders. And it says that the plan to spin-off Burger King is a permissive action, under the Board's statutory and judicially-recognized power, to develop greater value for the Pillsbury stockholders.
In a separate "auxiliary brief," Pillsbury argues that Grand Met's Tender Offer is coercive as a matter of law and Unocal
protects the Directors' decision not to redeem the Rights after a finding that the Tender Offer is inadequate.[7]
These and other contentions of the parties will be discussed hereafter.
 A.
The Delaware Supreme Court has, in carefully analyzed opinions, discussed the duty of a board of directors when a tender offer is made to its shareholders. The duties and the obligations of a board under such circumstances are widely known and, I suspect, carefully followed in the management of Delaware corporations. While the decisions are not a blueprint nor a code designed to cover every possible fact situation which may arise in tender offer litigation, they do provide a sure guide to the basic principles which must be followed and applied to the ever changing fact patterns that come before this Court. And as such, the decisions bring a certainty to our corporate law which is essential to those who conduct business under it.
The first case on "Rights" to reach the Supreme Court wasMoran v. Household International, Inc., 500 A.2d 1346 (1985) and, surprising as it may seem, that opinion was filed just three years and one month prior to this one. Moran is the "bedrock" on which a Poison Pill is authorized by Delaware law. Briefly stated, the Court ruled that a Rights plan is permissible under our Statutes, that a board of directors has the power to adopt such a plan, and a decision to do so is tested under the business judgment rule. Moran at 1351-1353, 1355.
But in the process of validating Rights and Pills, the Supreme Court did not give a board of directors unlimited discretion in applying such a plan to tender offers. On the contrary, the Court, following age-old principles which bind directors to a fiduciary standard, reminded us of just that, saying:
 When . . . [a] Board of Directors is faced with a tender offer and a request to redeem the rights, they will not be able to arbitrarily reject the offer. They will be held to the same fiduciary standards as any other board of directors would be held to in deciding to adopt a defensive mechanism, the same standard as they were held to in approving the Rights Plan.
Moran at 1354. After announcing that rule, the Court referred specifically to its earlier opinion in Unocal at 954-55, 958. *Page 1055 Unocal Corp. v. Mesa Petroleum Co., Del. Supr., 493 A.2d 946
(1985).
Unocal had been decided by the Supreme Court about five months before Moran. It was not a Pill case but it did involve a hostile tender offer (by a shareholder) to which a board of directors responded by making a self-tender for its corporate shares — excluding the hostile offeror from participation. As Chancellor Allen observed in Interco, at 790, Moran's reference to Unocal provides the appropriate legal framework for analysis of the critical issues here.
In Unocal, the Court said this:
 When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders. In that respect a board's duty is no different from any other responsibility it shoulders, and its decisions should be no less entitled to the respect they otherwise would be accorded in the realm of business judgment. . . . There are, however, certain caveats to a proper exercise of this function. Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred. . . . In the face of this inherent conflict directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership. . . . However, they satisfy that burden `by showing good faith and reasonable investigation'. . . . Furthermore, such proof is materially enhanced, as here, by the approval of a board comprised of a majority of outside independent directors who have acted in accordance with the foregoing standards. . . . In the board's exercise of corporate power to forestall a takeover bid our analysis begins with the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders. Guth v. Loft, Inc., Del.Supr., 5 A.2d 503, 510 (1939). As we have noted, their duty of care extends to protecting the corporation and its owners from perceived harm whether a threat originates from third parties or other shareholders. But such powers are not absolute. A corporation does not have unbridled discretion to defeat any perceived threat by any Draconian means available. . . .
Unocal at 954-55.
Thus, when a board considers a takeover bid, it is obliged to determine whether the offer is in the best interests of the corporation and its shareholders and, if the board gives a negative answer to that inquiry, a Delaware court will not substitute its judgment for that of the board, provided that the answer the Board gave can be "attributed to any rational business purpose," Sinclair Oil Corp. v. Levien, Del.Supr.,280 A.2d 717, 726 (1971), and, provided further, that it is determined that the standards required by Unocal have been met.Unocal at 954.
Both Moran and Unocal emphasize, strongly, that in the tender offer and poison pill contexts, a board must meet its fiduciary duties to its stockholders. Thus, a board may not "arbitrarily reject the offer" and a "request to redeem the Rights."Moran at 1354. The board's decision is held to the same fiduciary standards as any other board would be in adopting "a defensive mechanism." Moran at 1354.
Unocal at 955 says the same, that is, the "corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders." See also Revlon, Inc. v.MacAndrews Forbes Holdings, Del. Supr., 506 A.2d 173, 179
(1986), in which the Court, in an opinion filed about three months after Moran, wrote that in discharging their managerial function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders and those principles apply with equal force to a corporate merger and to corporate takeover issues. *Page 1056 
The Unocal criteria have been summarized in varying ways but I list them in what seems a reasonable order, and I include therein comments about this case.
First: The board must show that it had reasonable grounds for believing that a danger to corporate policy and effectiveness would exist if the Pill were redeemed and shareholder choice permitted. Unocal at 955. As to this, I conclude that no showing has been made that there would be a danger to policy or effectiveness of the Pillsbury corporation (that is, thecompany as company) if the Rights were redeemed and/or if Grand Met succeeds in its Tender Offer. Whatever danger there is relates solely to shareholders and that concerns price only.
Second: The board must show that it acted in good faith in considering a tender offer. Unocal at 955. I have no reason to believe that the Pillsbury Board failed to act in good faith when it disapproved Grand Met's Tender Offer.
Third: The board must show that it made a reasonable investigation of the tender offer. Grand Met argues that the Pillsbury Board did not make such an investigation, underUnocal standards, particularly when it refused to inquire into or negotiate as to the Offer. But, viewed as a whole, I cannot say as a matter of law or fact, that the Pillsbury Board failed to make a reasonable investigation as to the Tender Offer.
Fourth: If a majority of the board consisted of "outside, independent directors," their "proof" as to the Unocal
requirements noted above is "materially enhanced." Unocal at 955. While Grand Met suggests to the contrary, I conclude that a majority (12 out of 14) of the Pillsbury directors are "independent" within the meaning of Unocal.
Consideration of each of these factors is necessary to judicial examination when a board's decision is under review, but that by no means ends the matter. In other words, the above is not a litmus test applied to a color chart to determine whether or not the business judgment rule applies.
The Directors' duty, specified with particularity in bothUnocal and Moran, applies to the law in principle and, clearly, to the facts of this case. And that leads to the last or final test formulated in Unocal. There the Court wrote this:
 A further aspect is the element of balance. If [a] defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relation to the threat posed. This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Examples of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on `constituencies' other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of securities being offered in the exchange.
Unocal at 955.
This balancing or proportionality element refers to the effect of the takeover bid "on the corporate enterprise" but, as I have already noted, Pillsbury does not argue that, as a "corporate enterprise" it is threatened in any way by the Tender Offer. Whatever threat is involved relates entirely to the alleged "inadequacy of the price offered" to Pillsbury stockholders.[8] Unocal at 955. *Page 1057 
I turn now to the share price of the Offer which is the principal focus of Pillsbury's defense. Briefly, Pillsbury contends that $63 is not enough.[9]
Grand Met's Offer is a fully financed invitation to all Pillsbury stockholders to tender shares for a net cash price of $63 each. Grand Met's promise is to settle on the Offer and to pay each stockholder who tenders in the offered price as soon as the Pill is invalidated and the other relief it seeks is granted. The record contains substantial evidence that the per share price offered by Grand Met for Pillsbury is fair and adequate. That evidence includes verified statements by investment bankers and other financial analysts and experts, and by the reasonable inferences that may be drawn from market action. In the view of some brokers and commentators, the $60 price was generous. And although the Tender Offer has been widely publicized for more than two months, not a single competitive bid of any kind has been made.
In response to the Tender Offer, the Pillsbury Board has developed a plan which, it says, provides better long-term value for its stockholders. Essentially, Pillsbury contends that that alone is why it will not redeem the Rights.
The Pillsbury plan apparently contemplates:
(a) A spin-off of Burger King into an independent, privately-held company — with a recapitalization not yet announced; and
(b) A sale of the Steak Ale restaurants for cash within the next six months; and
(c) A sale of the remaining or other food businesses for a price and at a time not specified; and
(d) A sale of both Burger King and the remains of Pillsbury within the next 2 1/2 to 5 years.
It should be said that Pillsbury has been in a defensive mode since May 1988 and at various times since then it has, in addition to organizing a team of investment bankers and lawyers, explored or investigated many corporate alternatives, including recapitalization and a possible combination with each of about 15 different white knights.
Investment bankers support and critique each side of the controversy over the more productive way to create shareholder value. The respective depositions, affidavits and supporting documents are voluminous and weighty. But the bottom line in Pillsbury's plan is that, on a per share basis, the present minimum value (according to its experts) is $68 — and to realize that, a shareholder will have to be patient and endure for a long time, perhaps until 1992 or 1993. Moreover, Pillsbury's corporate performance must improve substantially in the future if it is to earn and receive (in the sales which are planned) the premiums that are the predicate for its optimistic forecasts. And a shareholder could well conclude that his/her Company's recent performance renders quite ambitious the assumptions upon which future hypothetical value is premised. In all events, expectancies over a four or five year period out into the nineties are subject to economic and competitive conditions which are beyond Pillsbury's control.
It is against this background that Unocal's balancing test must be made.
Certain it is that a Pillsbury shareholder, seeking to make a determination as to what is in his/her best interest, could conclude that $63 in present cash is preferable to the possibility of $68 if all of the "ifs" in Pillsbury's plan disappear and its hopes for the future become realities. But a stockholder in Pillsbury cannot make that choice unless the Rights are redeemed. *Page 1058 
What about Unocal's element of balance? Is the Board's defensive measure — the Rights and the Pill — "reasonable in relation to the threat posed?" Unocal at 955. I say again, and I emphasize, that the only "threat posed" here is to shareholder value — nothing whatsoever affects the corporate entity or any other constituency. But the real threat to shareholder value, as I see it, is not the spread between $63 and $68 per share. It is, rather, what will probably happen if the Pill remains in place and Grand Met's Offer is withdrawn. That threat of "loss," measured in dollars as to all Pillsbury shareholders, could amount to $1.5 billion and perhaps as much as $1.9 billion (assuming the price of the stock returns to its September 1988 level).
It is undisputed that Grand Met's Offer is the only factor supporting the present price (about $62) of Pillsbury's stock. Pillsbury implicitly argues that Grand Met will not walk but the Court must decide this case on the present record, not on the basis of speculation as to what Grand Met may do if the Pill is not redeemed. If the Pill remains at the end of this litigation and if the Tender Offer is withdrawn, the uncontested affidavits show that the price of Pillsbury's stock will fall into the high $30's — a drop of about $25 per share for some 76,000,000 shares.
Faced with the possibility of such a dramatic and costly decline in value, it is little wonder that about 87% of the Pillsbury shares have been tendered into the Offer. Shareholders who have tendered and who seek to sell as soon as possible include,
Bear Stearns and Co., Inc.: a holder of record of 14,050,000 shares of Pillsbury stock, — about 16 1/2% of the outstanding common;
The California Public Employees' Retirement System: the owner of 874,400 shares;
Kellner, DiLeo Co.: the holder of more than 500,000 shares;
Harvey C. Fruehauf, Jr., whose family was a co-founder of Burger King and who (with co-trustees) controls 1,000,000 shares;
The California State Teachers' Retirement System: the beneficial owner of 312,259 shares; and
Prudential-Bache Securities, Inc.: owner of 492,500 shares of Pillsbury stock.
The Pillsbury Employees Benefit Plans include Pillsbury stock held by Northern Trust Company as Trustee. Pursuant to instructions from the owners of the shares, the Bank as Trustee has tendered in 1,916,682 Pillsbury shares (50.6% of the total shares held in the Plans).
Unocal at 955 focuses on prohibited means to defeat a takeover bid. There, the Court said that a "corporation does not have unbridled discretion to defeat any perceived threat by any Draconian means available." Surely, Board action which bars Pillsbury shareholders from electing to sell their stock in a Tender Offer, (which, in consequence, may be regarded as a takeover bid) when, (a) only shareholder interest is at stake and, (b) only that Tender Offer is supporting a $1.5 billion rise in the market value of all shares and (c) when that value will undoubtedly vanish if the Offer is withdrawn, is harsh treatment of shareholders to whom fiduciary duties are owed. And the means to accomplish that treatment, considered in context and result, are Draconian.
 B.
In the principal, if not in all, Delaware cases validating use of the Pill, it is apparent that the purpose thereof was to create a "defense" against hostile, coercive acquisition techniques. In Moran at 1357, for example, the Court noted a "concern on the part of the Directors over the increasing frequency in the financial services industry of a `boot-strap' and `bust-up' takeover . . . [and] that such takeovers may take the form of two-tier offers." And it requires no extensive quotation to show that in Unocal, at 956, the Supreme Court noted, with some emphasis, that the "subordinated securities to be exchanged in Mesa's announced squeeze out of the remaining shareholders in the `back-end' merger were junk bonds worth far less than the cash offered at the front-end." Moreover, "the *Page 1059 
threat was posed by a corporate raider with a national reputation as a `greenmailer.'" Unocal at 956.
And in Revlon, the Court approved a Rights plan adopted by the Board of Directors in the face of a hostile takeover bid at a price, which was "grossly inadequate," offered by a "small, highly leveraged company bent on a `bust-up' takeover by using `junk bond' financing to buy Revlon cheaply, sell the acquired assets to pay the debts incurred, and retain the profit for itself." Revlon at 180-81. And see Ivanhoe Partners at 1342.
It would be ironic, indeed, if those cases and the shareholder-protective principles which they created were now turned 180 degrees and applied against Pillsbury stockholders who pose no threat of any kind to the corporate enterprise. That will be the result if the Pillsbury Board, even acting in the best of faith, has its way. And the Board's position is made even more ironic by its own plan to achieve value for shareholders by breaking up the Company during the next five years.
 C.
Pillsbury argues that Pogostin v. Rice, Del.Supr.,480 A.2d 619 (1984), bars shareholder choice in a tender offer.Pogostin was decided before both Unocal and Moran and, in it, the Court reaffirmed the business judgment rule as stated inAronson v. Lewis, Del.Supr., 473 A.2d 805, 812 (1984). And, said the Court, that rule is equally applicable in the context of a takeover. Pogostin at 627. It determined that a failure by a target company's board of directors to accept a substantial premium over market offered for its shares, or to negotiate with the offeror, was not a prima facie breach of fiduciary duty.
The issue was presented to the Court on a motion to dismiss for failure to make a demand, pursuant to Rule 23.1. Two grounds were asserted by the stockholder-plaintiff, namely, the directors had refused to accept the premium offered or to negotiate "solely because the four insiders sought to retain control of" the corporation, and, the "board had no proper business purpose for rejecting the tender offer." Pogostin at 626.
As to the first ground, the Court determined that it was without merit because "plaintiffs have failed to present any facts supporting their claims that the . . . board . . . rejected the offer solely to retain control." And, as to the second, the Court again referred to the complaint, saying that there is "nothing in [it] to suggest that the board's action was other than a carefully considered decision made on an informed basis." Pogostin at 627.
Pogostin has been cited by the Supreme Court in a number of subsequent decisions and it certainly continues as Delaware law. But, nothing in the opinion, or by fair inference in the pleadings, refers to the fiduciary duty owed to stockholders by directors, or the balancing test required by Unocal (decided about a year later), or the disenfranchisement of shareholders, or the interposition of a poison pill by Directors to absolutely preclude shareholder choice in the context of this case.
To say, as Pillsbury implies, that the Court intendedPogostin to be dispositive of all such issues under the stricture of the business judgment rule is to charge the Court with a purpose that it did not express nor fairly imply by any reasonable reading of its opinion. In my view, Pogostin is a restatement of the business judgment rule, made in context of the allegations, issues and argument submitted to the Court in that case, and it has been expanded and particularized as case law has been applied to Rights and Pill plans in Moran andUnocal. And this case must be decided under those rulings.
 D. Interco is the case closest to this one on its facts and in the fundamental legal issue. Each involves a board of directors' decision to keep in place a poison pill designed to defeat a tender offer. In Interco, the Chancellor determined that the Pill had served its purpose and the time period it had made possible had closed. The time frame and the relevant events within it may not be as specific here as they were in *Page 1060 Interco, but Pillsbury has known of Grand Met's interest since last May and the Tender Offer was made more than two months ago. Time is important in circumstances such as these and time alone carries a price when large amounts of capital are involved.
I agree with the Chancellor's analysis in Interco, much of which I have followed. See Interco, pp. 798 and 799. And here too, the respective positions are sufficiently developed to permit an informed shareholder choice.
 * * * * * *
I conclude that the Board's decision to keep the Pill in place was not reasonable in relationship to any threat posed and, therefore, the Board's decision is not protected by the business judgment rule. And since Pillsbury's Rights plan and its Poison Pill serve no purpose under the facts of this case, other than to preclude shareholder acceptance of the Offer, plaintiffs are entitled to appropriate relief.[10]
 V.
Next, I consider Pillsbury's argument that in the Tender Offer, even if for all shares and all cash and fully financed, Grand Met has retained an escape clause from the second-step it promises to take, that is, merging out non-tendering stockholders. (Apparently, such an option is commonly retained in two-step tender offers). Thus, says Pillsbury, the Offer is coercive because there is "risk" for stockholders at the second step.
I agree that, as to holders of Pillsbury shares which were not tendered, there may be coercion or risk. But I am not persuaded that such risk, if any, as to a 12%/13% minority is so serious that it should deprive the holders of the 87% majority of their right to elect whether to accept or reject the Grand Met Offer. I say this particularly because there is a way, in this Court of equity, to provide a safeguard for the minority without prejudice to the majority.
First, I think it should be noted that every shareholder who tendered or who does so while the Tender Offer is open, may withdraw his/her acceptance at any time before the Offer closes.
Second, the Tender Offer does not close until midnight on December 23, 1988, so each stockholder who has not tendered still has an opportunity to do so, if he/she so elects.
Third, as a condition of the relief granted herein, Grand Met will be required, on a best effort basis, to offer to buy every share of Pillsbury stock held by each non-tendering stockholder on terms no less favorable than those offered to the shareholders who tendered in. That offer is to be made forthwith after Grand Met has settled with those who tendered shares and after it is legally capable of controlling Pillsbury to accomplish this.
 VI. I now turn to the controversy involving Burger King. *Page 1061 
On November 6, Pillsbury entered into an agreement to spin-off Burger King as a separate company. Briefly, the plan is to distribute one share of Burger King stock for each outstanding share of Pillsbury common to stockholders of record as of December 2. That date has been changed by the Pillsbury Board to December 19.
Pillsbury announced that before the spin-off is implemented, it will cause Burger King to declare dividends of cash and securities payable after the spin-off. Pillsbury has not yet assigned a value to the spin-off nor has it announced the amount of the proposed dividend nor the date thereof.
Grand Met contends that both the spin-off and the proposed dividend are unreasonable responses to any "threat" caused by the Tender Offer. Specifically, it says that the spin-off may create a substantial tax liability for both Pillsbury and its shareholders, and the the proposed dividend will highly leverage the Burger King Corporation with a "crippling debt." Pillsbury concedes, tacitly at least, that if a gain is recognized on the sale of Burger King, it will be substantial.
Both plaintiffs seek an order enjoining the spin-off and mandating withdrawal of the record date (December 19) fixed by Pillsbury for the spin-off.
Pillsbury responds by saying, in effect, that its Board is in control of the Corporation, with all the rights and duties implied by that responsibility, that it must not be frozen in place by whatever action Grand Met takes, and that the Board must go about its business of creating value for its shareholders.
Given the conclusion I have reached on the merits of the pending motions, it necessarily follows that the spin-off must be enjoined, at least until this litigation, including all appeals, has ended. To do otherwise would be to invite chaos for Pillsbury and its shareholders, and possibly for third parties. Thus, Pillsbury's capital structure would be permanently changed by dividing the Company into two companies, and a spin-off would necessarily reduce the per share price in the Tender Offer to which the holders of some 66 million shares have responded affirmatively. And, on the record date, a creditor\debtor relationship may be created, under Delaware law, between Pillsbury and its stockholders. Wilmington Trust Co. v.Wilmington Trust Co., Del. Ch. 15 A.2d 665 (1940); and Selly v.Fleming Coal Co., Del. 180 A. 326, 328 (1935). Moreover, after the record date, the shares of the Burger King Corporation may be traded on a when-issued basis and that might well add innumerable third parties to the present controversy. Finally, there may be significant tax implications for Pillsbury and its stockholders if various other steps are taken in the relatively near future.
Given the uncertainties which now shroud corporate affairs, and for the reasons outlined herein, the planned Burger King spin-off should not be made, at least at this time.
 * * * * * *
For the reasons stated herein, I am satisfied that plaintiffs have established their rights to interim relief and their respective motions for a preliminary injunction will be granted. An order will be entered:
(a) Restraining Pillsbury, pendente lite, from spinning-off Burger King and/or in causing it to pay any dividends; and
(b) Restraining Pillsbury from taking any further steps to implement the Rights Plan and/or its Poison Pill; and
(c) Mandatorily directing Pillsbury to vacate or withdraw, not later than midnight, December 18, 1988,[11] the Resolution adopted by its Board of Directors to spin-off Burger King, and/or the shares of Burger King Corporation, to record holders of Pillsbury common stock on December 19, 1988; and
(d) Mandatorily directing Pillsbury to redeem any and all of the Rights issued *Page 1062 
under its Plan or taking other action that will exempt the current Offer from the effect the Rights have.
The order will be conditioned on, (a) prompt settlement by Grand Met with the Pillsbury stockholders who tender their shares under the Tender Offer; and (b) the filing in this Court by Grand Met of a document accepting the terms stated on pages 1060-1061 hereof. The order may contain other terms agreed to by counsel or fixed by the Court.
Given the time constraints with respect to the spin-off, counsel are instructed to submit an order forthwith and not later than 5:00 p.m., December 17, 1988.
[2] Briefly, the Pill plan is this: a dividend of one preferred stock purchase Right per share of common stock was distributed to each stockholder (with subsequent adjustments to maintain that parity); the Rights are exercisable ten days after a person or group has acquired beneficial ownership of 20% or more of the Company's stock, or, after a date designated by the Board following the commencement of a tender offer. The Pill gives non-tendering stockholders (except the person or group holding 20% or more of Pillsbury shares) the right to buy $200 worth of Pillsbury stock for $100. The Board retains the power to redeem the Rights (for $.01 each) within a specified time period.
The effect of the Pill, of course, would be to substantially dilute a successful offeror's equity interest and thus make the cost of Pillsbury so high that, without Board approval of a tender offer, acquisition is virtually a financial impossibility. An affidavit filed by Grand Met shows that if it were to acquire 85% of Pillsbury's stock pursuant to its $60 per share Tender Offer, the exercise of Poison Pill rights would reduce its equity interest in Pillsbury from 85% to 56.3% and its equity investment would immediately decline by more than $700 million.
[3] When first made, the Offer expired by its terms on November 1, 1988 but, in successive stages, it has since been extended to midnight on December 23, 1988.
[4] When first made, the Offer was for $60 per share. It was increased to $63 on December 12, the date of oral argument of the pending motions.
[5] Grand Met's letter to Mr. Smith also stated that ". . . we intend to make Minneapolis the world headquarters of our International Food Group . . . we are aware of the fine philanthropic and civic programs that Pillsbury supports . . . we intend to maintain Pillsbury's level of commitment to charitable and civic programs and to build on its relationships with employees and community leaders."
[6] Neither Grand Met nor Pillsbury has discussed the Statutes in the briefing on the pending motions.
[7] The auxiliary brief refers extensively to 8 Del. C. § 203
(the Tender Offer Statute) and the Delaware State Bar Association's Report with respect to § 203, but Pillsbury does not charge Grand Met with any violation of § 203 and there is no purpose to construing it now. I note that the Synopsis to the Statute emphasizes that it is not intended to alter case law development of directors' fiduciary duty of care and loyalty.
[8] The Supreme Court gave other examples of appropriate director concern when organizing a defensive measure:
(a) The nature and timing of the offer: Whatever valid criticism Pillsbury may have of Grand Met's timing, that timing was in significant part, at least, a consequence of Pillsbury's admittedly poor performance for a year or more preceding the Offer; and in any event, the Pillsbury stockholders are not responsible for Grand Met's timing and should not be penalized for it.
(b) Questions of illegality: None are argued here.
(c) The impact on constituencies other than shareholders: Such an impact has not been argued. But, as noted hereafter, 50% of the Pillsbury shares held in Employee Pension Plans have been tendered in.
(d) The risk of nonconsummation and the quality of the securities being offered in exchange: The Offer is for all cash and it has not been argued that it is not fully financed. And whatever "risk" is involved would fall on those shareholders who do not tender and their risk will be discussed hereafter.
[9] During negotiations last weekend, Grand Met offered $65 a share, as described during oral argument, "to acquire the company on a negotiated and friendly basis then and there. It was worth it to us. Their people have, I think, 21 lawsuits pending against us. The defense of that litigation has become very considerable and very burdensome." It can be said that the Poison Pill has functioned, as Pillsbury argues, to bring the Offer to $63 — indeed, to $65 — but the Board apparently planned to keep it in place no matter what the Offer was, short of $68.
[10] Compare Conoco Inc. v. Seagram Co., Ltd.,517 F.Supp. 1299 (S.D.N.Y. 1981), a tender offer case in which Seagram and the Du Pont Company were competing for control of Conoco. The Conoco Board of Directors supported the Du Pont proposal because, in its judgment, that plan was more favorable to the stockholders. On that basis, Conoco sought a preliminary injunction barring Seagram from purchasing Conoco shares under its tender offer. The Court denied relief.
Conoco was not decided under Delaware law and a poison pill was not in place. But the Court's opinion does discuss the shareholders' right of franchise vis-a-vis directors, saying:
 To be sure, the Board of Directors are under a duty to exercise their best business judgment with respect to any proposal pertaining to corporate affairs, including tender offers. They may be right; they may know what is best for the corporation, but their judgment is not conclusive upon the shareholders. What is sometimes lost sight of in these tender offer controversies is that the shareholders, not the directors, have the right of franchise with respect to the shares owned by them; "stockholders, once informed of the facts, have a right to make their own decisions in matters pertaining to their economic self-interest, whether consonant with or contrary to the advice of others, whether such advice is tendered by management or outsiders or those motivated by self-interest."

[11] Pillsbury may comply with this requirement by postponing the record date to a date fixed by the Court.